Good afternoon, Your Honors, and may it please the Court. Matthew Litt from Litt Law LLC on behalf of the Appellant Plaintiff, Sam Antar. And may I please have three minutes for rebuttal. Granted. Thank you. From the outset, I think it's critical to make the distinction between what this case is and what this case is not. This case is not about a casino passively permitting an addicted gambler to use his casino. And it is not about a casino's failure to stop him from doing so. What this is, is a case about a casino aggressively enticing and manipulating a known problem gambler to make deposits and place bets so that he can continue and exacerbate his addiction for the defendant's sole benefit. Could you specify precisely what the unconscionable business practice is? What specific action are you saying is the unconscionable business practice? The communications in furtherance of the enticement of an addicted gambler to gamble on their website. So the communications from the website to Mr. Antar? Well, from people. They were from the VIP hosts, two individuals. Specifically, most of them were from an individual named Jerry Lang, and then there was a second individual as well. Text, sending him text messages in real time, 1,800 between the two of them from June 2019 to January of 2020. Okay. Wouldn't he have lost all this money anyway because he was a gambling addict? How can we ascertain how much of his loss the defendants caused? So the damages are completely ascertainable. They're not presently ascertained because we have not been through discovery, but the defendants keep data on every minutia, every deposit, every bet through discovery. Okay. We can figure out how much money he lost, but it's a different question how much he lost because of the particular practices, the unconscionable business practice playing into addiction. We have to do some kind of very fancy but for footwork. How do we know that he wouldn't have lost all the same money anyway because he was a gambling addict? Respectfully, Your Honor, I disagree he would have lost the money necessarily anyway. I think- But you have to show that. You are the plaintiff. You have the burden of proof. How do you show how much he would have lost? 100%. You're right about that, Your Honor. So we would show that, I think, in one of at least two ways. Number one, we have a bright line date here, which is August 15th, 2019, when the defendants were served with a subpoena from the New Jersey Division of Criminal Justice telling them that there was a suspicion of illicit activity on their site. Without question, incentives should have stopped on August 15th of 2019. Okay. And they didn't. Fine. But what causally flows from that? How do you know what the world looks like if no texts are gone after that date? They deprived him of the opportunity to seek help. The casino is no- Opportunity. But the point is, if he would have gone and gambled and lost money anyway, how do we know how much was because of the texts rather than despite the texts? Respectfully, Your Honor, I don't believe that he would have gone and gambled the money anyway if he wasn't incentivized to do so by these VIPs. How are you going to prove that? Through an expert testimony, expert testimony on addiction. I mean, just like any other addiction, and certainly there are civil cases involving opioid addiction, tobacco addiction, alcohol addiction. All of those things can be a little more intricate and do require expert testimony. But an expert testimony can look at the data that was used to track Mr. Antar. They could step into the shoes of the casino. We will understand what their training was because these defendants were trained to recognize what problem gambling looked like. They saw it in Mr. Antar and targeted him because of it. So is it easy? Can I stand up here right now and tell the it is absolutely unassertainable. But the defendant is not the only casino in New Jersey, right? Correct, Your Honor. And he could have simply gone to another casino or he could have gone to Nevada or he could have done sports betting. I mean, how do we know? Respectfully, Your Honor, he didn't do those things and he could. He didn't do it because he was betting gambling with the defendant. And the New Jersey cases like Enri Borgata and Roby say, in these circumstances, we don't know that he's worse off as a result. Judgment for defendants. I disagree, Your Honor. I don't think those cases had the facts that we have here, the clear cut, the subpoena. I mean, I keep going back to the subpoena. Once a subpoena is served on a casino for an individual consumer, they have to stop incentivizing him to gamble. That can't be. Where in the record is the subpoena? It is in the complaint. Okay. What paragraph? If I may have just a moment, Your Honor. There's a mention of it in paragraph 66. This is August 15th, 2019. Thank you, Your Honor. It's in paragraph 66 of the amended complaint, correct? Thank you. I was almost there. You beat me to it by a few seconds. Okay. Sort of following up on my colleague's questions, as far as losses and the benefit of the bargain, the defendants here basically say the benefit of the bargain is a gambling experience. You say true, but at some point, it's a worthless benefit because he is a gambling addict. You seem to say at some point, the experience is worthless because of this condition that he has. I assume you're not saying it was on day one. You can see that the gambling experience was the benefit on the first day he gambled. 100%, Your Honor. That's correct. I think just like any other addiction, it starts as something casual and responsible, but at some point, evolves into something addictive. There is no gambling experience. There is no entertainment for an addicted gambler. It's just the exacerbation of the hell of the addiction. Your theory is that at the latest on August 19th or August 5th or 15th, whatever, 2019, that is when the defendants would have actual notice that he suffered from this condition and therefore should have known that somehow the benefit of the bargain has now changed. They are at that point to the extent they didn't know previous to that, that this was an addicted gambler, which I believe they did based on the volume of communications, the volume of deposits, but let's assume for sake of argument that they didn't until August. Now, here's another irrefutable piece of evidence that- But in order for your theory to work, they have to at some point know that despite the fact that at the beginning, they engaged in one understanding of the benefit of the bargain. At some point, they would have to know that it changed for you to prevail. Correct, Your Honor. They're trained in recognizing that change. They are trained to know what that looks like. This isn't all done in a vacuum. I'm not just hoping that they recognize the signs of problem gambling. They recognize it because they're trained. They're obligated to be trained in it. The VIP hosts, anyone who is consumer-facing, who is speaking with someone- They're only obligated to stop communications if a gambler self-excludes. That's correct. That's correct, Your Honor. Well, I would say they're only obligated to close their if the gambler self-excludes. But gamblers don't self-exclude until they're in dire straits. But isn't there a specific provision that they also have to cease communications if the gambler makes that, either in the self-exclusion process- Yes, that's included in the self-exclusion. Correct, Your Honor. That's correct, Your Honor. But again, the Casino Control Act does not cover the types of communications underlying this lawsuit. The Casino Control Act covers gaming-related advertisements. It does not talk about communications from a VIP host. But it's not clear that the CFA would cover this either. I mean, it seems like in the tension between the CCA and the CFA, you know, regular, if I put up my poster, hey, come bet here, lucis slots, whatever, that's a normal advertisement under the CFA. But this kind of targeted one-on-one communication seems to possibly be outside of the scope of CFA and moving more towards the CCA. Can you address that? Yes, Your Honor. So I disagree that it's moving towards the CCA. But I also think, Your Honor, is correct that the CFA has not covered this set of facts yet because this set of facts is new. This consumer fraud has not happened yet. It's new. This is the first time it was before the district courts, the first time it's now before the Third Circuit. But the Consumer Fraud Act is explicitly supposed to cover new fraud. It's supposed to be expansive. It's supposed to be- And you had specifically noted in your recent letter that it's guided by the capacity to mislead. Can you point me to statements in the complaint that have the capacity to mislead and why they have the capacity to mislead? For instance, hey, I'll give you a $3,000 credit. How, where's the capacity to mislead in that? Unless you're saying he didn't get his credit. No, no. And certainly that's not what I'm saying, Your Honor. So it's not misleading, it's not misleading or deceiving in the conventional way, in the way that the Consumer Fraud Act has used that or the courts have interpreted that term in the past. It's misleading and deceiving in that it convinced a gambler in the throes of an addiction to destroy his life in whole or in part. Misleading, that's not deceiving. That's exploitative, but that's not what the Consumer Fraud Act talks about. I respectfully, Your Honor, I believe that the to include that depth. Is there any dictionary that defines mislead or deceive that broadly? You haven't cited any. I'm unaware of any, of any dictionary. Is there any precedent from New Jersey that defines it that broadly? The precedent is the, is the broad and expansive use of the Consumer Fraud Act, Your Honor. No, it has not been used in that way. You don't have a state precedent. And we, we sitting in diversity, we're supposed to be predicting based on the state decision. So what data points do you have that allow this to proceed? And the New Jersey Casino Statute talks about problem gamblers and talks about various ways to deal with them, but does not offer a cause of action for inducing a problem gambler to gamble. That's exactly right, Your Honor. And that's why the Consumer Fraud Act and the negligence cause of action stand because the, because the CCA is silent on those issues. Because it is silent, does that not speak to the fact that it is saying there should be no such remedy in New Jersey? It does not, respectfully, Your Honor. The consumer, the CCC has primary jurisdiction. So they can make a rule that would, that would guide this, but they haven't. And the fact that they haven't means that the Consumer Fraud Act is presumed to not be preempted. And it also allows a cause of actions for negligence to go forward as well. Do you have any source or support for the statement that the fact that they haven't provided that remedy when they have discussed the problem means that the remedy is elsewhere? Isn't it equally logical that they haven't provided that remedy because they don't think that remedy is appropriate? Respectfully, Your Honor, I, I don't think it is. And the fact that the, that the CCC touches on an issue is not the same as a conflict with it. And there is case law that, that, that I cited, which requires a sharp and actual conflict with the CCA, not just merely touching on it. There will be no interpretation required of the CCA in this case. And as such, there's no conflict and the CFA and negligence causes of action are permitted to go forward. I ask, we haven't touched on your negligence that much. What is the act of negligence here? Is it a failure to recognize addiction under your theory, failure to stop communication? What exactly is the negligent act? Yes. Thank you, Your Honor. So again, the act of negligence is, it's not passive, it's active. It's not that they fail to do something. It's that they use their product in a way that they knew to be dangerous and the plaintiff was harmed thereby. No different than, than the salesperson of, of a toaster oven. I mean, they knew that this person was being harmed by their product and they didn't just permit him to do it, but they incentivized and encouraged him to continue, to continue using it. You know, frankly, we're just, we're not, it's not necessary to reinvent any wheel on the negligence issue. Defending corporations sold and incentivized plaintiff to purchase goods and services they knew were hurting him and he was damaged by, thereby. This is textbook negligence. And you know, the case law cited a plaintiff is not required to establish a standard of care and it's certainly not at the outset, at the motion to dismiss stage. So it's a balancing test, which weighs heavily in favor of finding a duty when the harm of the plaintiff is significant and the imposition on the defendants, as it would be here, is, is minimal. Thank you, Mr. Litt. Thank you, Your Honor. I'll have you back up above. I believe Mr. McGill is the first of the two for appellants. Thank you, Your Honors. And may it please the court, Matthew McGill for Appalee's Marina District Development and MGM Resorts International. I'll be focusing on plaintiff's Consumer Fraud Act claim, while my colleague, Mr. Reinhart, will be focusing on plaintiff's negligence claim, but we each are prepared to answer any questions you may have about the plaintiff's negligence  to address the court's questions as to either claim. All right. So you're going to be focusing on the preemption bit. There's a lot of regulations on general contact with gamblers, but set aside the, the junket rules and the training for employees for direct contact rules. Does any other rule cover direct contact? And why do the rest of the rules matter here for, for, for, for preemption? The, I'm not aware of any rules issued currently by DGE that cover the text message communications at issue here, but I want to go back to how the plaintiff defined the practice here that's at issue. He defined it as enticement of known addicted gamblers. And the, the regulatory regime comprehensively deals with the issue of problem gamblers, and it does it in a particular way. It start, it empowers the individual by giving them access to information and access to, to help when they want it. Every time they log on, the 1-800 gambler number comes on. Every time they deposit money, they're told that they have access to these, these resources if they need help. This is the scheme that the expert agency designed that balances two competing and somewhat divergent interests. And this is what this court discussed in the Doug Grant case. It says that the, the act has to deal with these competing interests of, on the one hand, fostering a vibrant casino industry within the state of New Jersey, while on the other hand, protecting consumers. But as I noted, almost all of them are not about direct contact. So we got these different cases from the state. On the one hand, Bandler and Smerling say, hey, these general advertising kinds of claims, they're not preempted. There's a presumption against preemption, general advertising claim, nothing technical about casinos about it. On the other hand, Doug Grant, when you get into the nitty gritty of how blackjack games work, that's preempted. This doesn't look like a nitty gritty how to use the blackjack or roulette wheels. This looks like a, how you're reaching out to people. Are you deceiving? Are you misleading? That's like standard advertising fare. Why can't the, the general advertising regulation under Consumer Fraud Act coexist with the casino scheme? It's again, it turns, it goes back to how he defines, the plaintiff here defines the, the practice that he's targeting. And he's targeting not just enticements in general. He's not saying enticements in general that are misleading in nature. That would be on the Bandler side, right? That, that would be almost the facts of Bandler. Come on in for a particular prize. Now Bandler, of course, is not a New Jersey Supreme Court decision and Grant, Doug Grant, I would note, focuses pretty rigorously just on the, what the Supreme Court has answered to Bandler. Here, he's focused on the particular effects of enticement on problem gamblers. And that is an issue that the, that the DGE deals with directly. And frankly, they are the agency that is much more competent to do it than the court system. There are other independent, fully independent bases upon which the dismissal of the Consumer Fraud Act should be affirmed. The enticements that plaintiff targets here are not alleged by him to be misleading in any way, nor do those enticements, as alleged in the complaint, have any objective capacity to mislead. That's the prime ingredient of any Consumer Fraud Act claim. The plaintiff himself concedes that in his supplemental brief. It's entirely absent here. The third, he can't show any ascertainable loss under the New Jersey Supreme Court's decision in Robie. The plaintiff claims that the gambling activity in which he engaged was worthless because he was addicted to gambling. But Robie requires an objective analysis of value. It's not just in the eye of the beholder. It's not in the eye of the plaintiff. What matters is the objective, the objective value. And that, that's really the disagreement, in fact, between the dissent and the majority in Robie. It's about what about the effect on the individual buyer? Well, that was the losing, that was the losing argument in Robie. What Robie said at page 468, or 467, it must be an objective measurable disparity between the product they reasonably thought they were buying and what they ultimately received. An objective measurable disparity. That forecloses a theory of ascertainable loss based on the status of the person, the purchaser. And that's what the plaintiff is bringing here. The fourth point I goes back to your question at the beginning, Judge Bevis, is about causation. How the causation element applies to the Consumer Fraud Act claim as well. How could we possibly unravel this? I'll note at page four of the supplemental brief, he, the plaintiff says, he would use any and all funds accessible to him, accessible to him, to continue depositing and betting until there were no funds remaining. That is how the plaintiff's counsel himself characterizes the nature of his addiction. That forecloses any causal link to the enticements that he targets here. So for at least, even if you did not agree with the district court's analysis on the application of the Consumer Fraud Act or the preclusion of the applicability of the Consumer Fraud Act claim, you have insuperable barriers and the misleading element, the ascertainable loss element, and the causation element, all of which would suggest that this court should affirm the dismissal of the Consumer Fraud Act claim. If there are no other questions, I will turn it over to my colleague, Mr. Reinhart. All right, Mr. Reinhart, take your time whenever you're ready. Good afternoon. May it please the court, Dan Reinhart, Blank Roam, LLP. Together with my colleague, Stephen Orlovsky, we represent defendants, appellees, BetMGM. I'll be addressing the negligence claim, the second cause of action in Mr. Antar's amended complaint. We're here to ask the court not to impose a novel duty of care for casinos to identify and then stop compulsive gamblers from gambling, which is, I think, how we understand this negligence claim. Now, we just heard, perhaps, a slightly different description of that from counsel for Mr. Antar, who said the Act is an active, not a passive action. Using a product in a dangerous way. Yeah, using a product in a way known to be dangerous, like a toaster oven or something like that. And that is not how we understand this. That, I guess, would be the website itself somehow being used in a dangerous way. We have understood the duty of care and have argued it as one to identify compulsive gamblers and stop them from gambling, which is essentially what's been argued about Mr. Antar. Exactly. His argument doesn't seem to be to stop the gambling. It's just to stop affirmatively communicating with his clients. So, can you address that? Then the Negligent Act would be enticements. And this is part of the problem, is we're guessing at what the alleged Negligent Act would be. And the Negligent Act would be aggressive enticements to someone known to be a compulsive gambler. And then, presumably, to reimburse gambling losses to the person who was receiving the enticements. And nothing like that's ever been done, not in New Jersey, not in any state, not by any legislature. Because the gambling, the Casino Act in New Jersey and in other states, is a balancing act between the economic health of the casinos and also protecting the gamblers. And some of the four factors in ascertaining whether there's a duty, one could see there being appetite for not preying upon someone who is a problem gambler. And it doesn't seem that, whereas in the preemption realm, the CCA is very relevant. How are we to understand whether or not there's a public interest in light of the CCA's regulation of problem gambling, communications, identification, and things like that? Thank you. In the realm of the negligence duty. Thank you, Your Honor. So this obviously is not a preemption argument, but the CCA in New Jersey is the clearest sign of what the legislature has intended. And it's very important, and it's been noted by the Hockamoglou Court and the Tavares Court and others that we referenced, including one that's not published and not precedential, but nonetheless insightful, which is the Harris versus, let me get the right name here, Harris versus D'Angelico, which was the appellate division of New Jersey five years ago. They all have said, all right, the New Jersey Supreme Court hasn't addressed this issue. But you look to previous decisions, which are Hockamoglou and Tavares, or you look to the legislature's intentions. And so the CCA gives us the clearest sign of that when you look at how it has regulated the identification of problem gamblers. And they have not required casinos to identify problem gamblers or stop them from gambling, either one. They require them to have training on identifying problem gamblers or compulsive gamblers. There are a series of regulations. They require the casinos to have internal controls and programs to identify problem gamblers. They require that problem gambling resources be provided, the 1-800-GAMBLER and things like that, that we've been talking about. They require you to provide the gamblers with the option to self-exclude if the patron has a known problem with compulsiveness. Because, of course, compulsiveness doesn't mean they've lost their ability to know what's happening. It's an even clearer argument than the Hockamoglou drunk gambling problem, where someone who's intoxicated might not know exactly what's happening. Someone who's compulsive knows what's happening. They just can't control themselves. So someone who's compulsive, there is a legislative framework in place to allow them to protect themselves. And that's the way the legislature has set it up. And it makes sense because when you look at how the duty might work under the four factors that you just mentioned, Judge Chung, under the Hopkins v. Fox & Lazo Realtors New Jersey Supreme Court standard, right, the first one is what's the relationship of the and here the relationship is one of enabling gambling, not stopping people from gambling. The casino is in the business of providing gambling. Mr. Antar is the customer. The second issue is the nature of the risk. And of course, there's a risk that the patron may lose money, but that is the risk that everyone knows about when they're gambling. It's part of the experience and perhaps the thrill of gambling. The third issue, the third factor, and this is the biggest problem with a negligence claim in this area, is does the casino have an opportunity and an ability to exercise care? And so how would the casino do it? We know they have training on how to identify problem gamblers, but how do they say this is the one we're not going to entice? And by entice, I mean, that's a strong word. This has been going on forever. In the Taveras case, this wasn't passive enticement in Taveras. It was very aggressive enticement. Ms. Taveras, alleged that she was eating, sleeping in the casino five days a week all the time. She alleged she gambled $20 million. She claimed her family came to get her and the people in the casino wouldn't let her leave. We don't have specifics about this August subpoena, but let's say the subpoena said, Mr. Antar has been stealing money to gamble. We need all his gambling records. It put them on active notice that he has no money and he's in fact committing crime to continue to gamble. How does that at least give them some sort of duty to stop at the very least communicating with him? I mean, it sounds like by the end here, he was being contacted multiple times a day, every day, and on average, maybe nine times a day. So how are, again, knowing that there's no facts about the subpoena and the complaint other than that there was a subpoena, just assume it gives that fulsome of information to the casino. Sure. And I believe that the facts as alleged are that the communications did go both ways, but of course he says it was a constant stream of enticements. And this has been going on for a long time with offers of free trips and free hotel rooms and limousine rides. And in his case, he was getting cash bonuses. And this is a very common practice that is regulated by the CCA in terms of what sort of bonuses can be offered. When it comes to a subpoena coming in, it feels like an unusual fact. However, does the casino have the burden to try to figure out what's happening in the legal proceedings of one gambler in order to determine whether it can offer him bonuses or cash back offers? It feels like a burden that's a slippery slope. And part of the problem is who is a compulsive gambler, right? Is it only someone who you get a subpoena on, or is it someone who, as Mr. Antar alleges, gambles $30 million in total in six months, or someone who gambles all day long, multiple games? He alleges the frequency, the number of hours, chasing losses, and the number and the amount of money all made him a clear and obvious compulsive gambler. But when you think about how hard it would be for a casino... Thank you. Okay. Thank you for your time. Mr. Lidd, I think you have three minutes. Thank you, Your Honor. So defendants are discharacterizing the plaintiff's argument on negligence. This is not, it was never about whether they should exclude or whether they were responsible for not saving the plaintiff from himself. The idea that I just made that up at oral argument for the first time right now is absolutely untrue. Page 21 of my submission to the Third Circuit. The question is not whether a casino operator is liable for passively permitting a compulsive gambler into his casino, but rather the active and aggressive enticement of an addicted gambler with relentless near daily personal and real-time text message enticements from a casino host employed and rewarded by appellees for squeezing as much money from the addicted gambler as they can until the consumer hits rock bottom. That's on page 21 of my initial submission. So the idea that this is being heard for the first time means the defendants didn't read the brief because it's been in there and this has been our position all along. Defendants treat this as a hypothetical. How can we possibly know that a particular consumer is addicted? I can't speak for other cases. I can speak for this case in particular. In this case in particular, the defendant's employees, the two gentlemen who were charged with incentivizing Mr. Antar to continue gambling were trained in recognizing the signs of problem gambling. That's how they would know that he's addicted to gambling, because they were trained to recognize the signs. Now that wasn't true in Hakamoglu, decided decades ago. That wasn't true in Tavares, decided in 2008. That problem has been eliminated. The precedential value of both of those cases is respectfully close to nothing, if anything at all. Hakamoglu, in the text of the case, Justice Alito even said, this case is of dubious precedential value. We wish we could ask the New Jersey Appellate Division, we wish we could certify the question to the New Jersey Appellate Division, but we can't. So he said, so we're going to give it our best shot, but we doubt that this is going to carry very much longer. That was decades ago. And Tavares was decided in a completely different world, not to mention that it's an unpublished district court decision. I just want to, I guess I'll end off with this, unless the court has any other questions. I think it's important to refer back to Smerling in wrapping up, where the Appellate Division in New Jersey was careful to make sure that the plaintiff was not left without a remedy, which is what the defendants would have done here. As the Appellate Division said in Smerling, indeed, any other result but permitting the causes of action to proceed would leave plaintiffs remedy-less, since the Casino Control Act clearly does not empower the CCC to award damages in private matters. And Judge Roth, you I think made the point, well, that the DGE may be better equipped to do it. That may be true, but they haven't done it, and the fact that they haven't means that the plaintiff's remedies survive. Thank you. We thank both sides for their helpful briefing and argument. We'll take the matter under advisement. We will recess, and before we leave, we'd like to greet arguing counsel over at Sidebar to thank you for your presence.